

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal No. 1:20cr209 |
| MICHAEL BEATTY, | |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, MICHAEL BEATTY ("BEATTY"), stipulate that the allegations in the Criminal Information and the following facts are true and correct. The United States and BEATTY further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

### I.   GENERAL ALLEGATIONS

1. TRICARE is a health insurance program of the United States Department of Defense. TRICARE provides civilian health insurance benefits for military personnel, military retirees, and military dependents all around the world. TRICARE provides medical coverage for Uniformed Service members including those who are active duty and some reservists along with their families. There are two types of beneficiaries under the TRICARE program: (a) Sponsors – active duty, retired and guard/reserve members; and (b) Family Members – spouses and children who are registered in the Defense Enrollment Eligibility Reporting System.

2. In order to pay a claim, TRICARE requires that the item or service being billed must be medically necessary, properly prescribed by a licensed physician, and actually provided to a TRICARE beneficiary.

3. TRICARE is a Federal health care benefit program as defined by Title, 18, United States Code, Section 24(b), and as such it is illegal for an individual to pay kickbacks to a person for the referral of an individual for the furnishing of some health care item, benefit, or service.

4. 32 CFR Part 199 regulates the TRICARE program. 32 CFR § 199.9(c)(12) prohibits "[a]rrangements by providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge the [Civilian Health and Medical Program of the Uniformed Services] through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits." TRICARE considers a claim resulting from a violation of 32 CFR § 199.9 as false and TRICARE would not pay for these items or services.

5. "Compounding" a prescription is a practice in which a licensed pharmacist or licensed physician combine mixed or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient where standard medications, approved by the United States Food and Drug Administration ("FDA") are unsuitable due to patient allergies, intolerance to method of administration, or other uncommon factors. Compounded medications are prescribed and mixed for specific patients with particular needs; they are not to be mixed and marketed in bulk quantities. Compounded drugs are not FDA-approved. That is, the FDA does not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs.

6. In general, compounded drugs are far more expensive than drugs approved by the FDA for the treatment of the same physical condition and are commonly reimbursed by Federal health care programs and private insurance companies at a far higher rate than FDA-approved drugs.

**II.     THE KICKBACK CONSPIRACY**

7. From in or around spring 2013 and continuing to in or around fall of 2014, both dates being approximate, in the Eastern District of Virginia, the defendant, MICHAEL BEATTY, knowingly and willfully did combine, conspire, confederate and agree with ███ ████████████████████, and others, known and unknown, to commit the following offense against the United States, that is the violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to physicians to induce the physicians to refer individuals to a pharmacy operated, controlled, or worked at by BEATTY for the furnishing, and/or arranging for the furnishing, of items and services for which payment was made, in whole or in part, under a Federal health care program, namely TRICARE.

8. From in or around December 2002 and continuing to in or around December 2013, BEATTY was an owner of FALLSTON PHARMACY, located in Fallston, Maryland. BEATTY's wife also had an ownership interest in the pharmacy. Throughout BEATTY's ownership of FALLSTON PHARAMCY, the pharmacy produced compound drugs on a small scale, which it advertised on its Web site.

9. In or around late spring or early summer of 2013, BEATTY was approached by ██████, a physician specializing in orthopedic surgery, spine surgery, physical therapy, and comprehensive pain management services who owns a medical practice called ████████ ████████████. ██████ has offices in Maryland and in the Eastern District of Virginia. ██████ suggested that BEATTY and ██████ do business together. ██████ indicated that he had seen on FALLSTON PHARMACY'S Web site that FALLSTON PHARAMCY produced compound drugs. ██████ followed up with an email on or about June 13, 2013 in which ██████ noted that

BEATTY had been in touch with ▇▇▇ business associate, SETH MYERS ("MYERS"). BEATTY was advised that MYERS could help generate prescriptions for the pharmacy. In the email ▇▇▇ inquired whether BEATTY had been able to put together reimbursement numbers regarding formulas for compounded medications.

10. On or around July 9, 2013, ▇▇▇ BEATTY, and MYERS met at a restaurant in Baltimore, Maryland to discuss potential business opportunities. At the meeting, ▇▇▇ informed BEATTY that ▇▇▇ was looking for a compounding pharmacy to which ▇▇▇ could send a significant number of prescriptions for his patients, and he needed a pharmacist who could develop compounding formulas. ▇▇▇ stated that he would refer patients to BEATTY and that MYERS could identify additional patients. ▇▇▇ indicated that he could bring FALLSTON PHARMACY significant new business through compounded drugs. In exchange for referring patients for compounded prescriptions, ▇▇▇ and BEATTY agreed that BEATTY would kickback a portion of revenue or profits from these prescriptions to LABRX, which BEATTY came to understand was controlled by ▇▇▇

11. In order to disguise the bribe and kickback payments, ▇▇▇ and MYERS created a sham business arrangement in order to promote the appearance that FALLSTON PHARMACY was paying for legitimate services, rather than for the acts of prescribing and referring compounded drug prescriptions. When presented with the arrangements, BEATTY agreed to enter into it.

12. Specifically, following the meeting in Baltimore, Maryland, MYERS provided BEATTY with a document entitled Area Manager Agreement (Independent Contractor). Pursuant to this agreement, MYERS agreed to provide "marketing" services for FALLSTON PHARMACY in exchange for fees. MYERS agreed to "devote such time, energy and skill on a regular and consistent basis as is necessary to solicit orders and promote the sale of Fallston Pharmacy's

products." In exchange, BEATTY agreed to provide LABORATORY RX, a company owned by Myers, "50% of the sales on all products sold to customers by the Area Manager . . . and 50% on all products sold by his/her subordinate marketing representatives." BEATTY came to understand this agreement to mean that he would remit to MYERS 50% of the gross proceeds of all prescriptions directed to the pharmacy by ▮▮▮ any of ▮▮▮ affiliates, and any other doctors designated by MYERS. While ▮▮▮ was not a signatory to the contract, BEATTY came to understand during the pertinent time that ▮▮▮ was financially benefitting from the agreement due to ▮▮▮ significant involvement with the arrangement and the number of prescriptions being generated by, and promised by, ▮▮▮ MYERS and BEATTY executed this agreement in July of 2013.

13. Although MYERS was the nominal owner of LABORATORY RX, the company to receive the kickback payments, ▮▮▮ actually controlled the business and benefitted most from its operation. Eventually, during the conspiracy, BEATTY understood that the agreement was for the referral of prescriptions and for kickbacks paid for these prescriptions.

14. In order to further the arrangement, BEATTY developed potential compounded formulas and investigated whether insurance companies would pay for the particular formulas. BEATTY advised ▮▮▮ the compounds that received the highest financial reimbursements and the medical conditions for which the compounds could be used. The goal was for ▮▮▮ to fit the diagnoses of his patients to the compounds that reimbursed at the highest amount. ▮▮▮ was already aware of some of these high-reimbursing compounds because he provided some of these formulas to BEATTY. As a result, ▮▮▮ wrote prescriptions for high-reimbursing compounds when alternative cheaper prescriptions were available for patients. BEATTY in turn filled these prescriptions.

15. In late 2013, ▇▇▇ MYERS, and BEATTY met at a restaurant located in Baltimore, MD. At this meeting, ▇▇▇ and MYERS expressed frustration at BEATTY because ▇▇▇ and MYERS believed that more money should have been generated from the kickback arrangement. ▇▇▇ and MYERS also complained about various issues related to insurance companies not paying for certain compound prescription formulas. Specifically, among other issues, ▇▇▇ was upset with BEATTY that a large quantity of prescriptions were being sent to FALLSTON PHARMACY but a much smaller fraction were filled.

16. From December 2013 to February 2014, BEATTY sent the following payments to LABORATORY RX from M&M Beatty LLC, totaling an approximate amount of $7,370.64 pursuant to the above-described kickback arrangement. M&M Beatty LLC was a company owned by BEATTY and his wife. MYERS monitored the payments and sent BEATTY an email on or around February 18, 2014 noting that MYERS was missing the payment for December of 2013.

| Date | From | To | Amount | Memo Note |
| --- | --- | --- | --- | --- |
| 09/23/2013 | M&M Beatty LLC | Laboratory RX | $5075.88 | compound profit |
| 12/10/2013 | M&M Beatty LLC | Laboratory RX | $555.33 | compound profit – oct and nov 2013 |
| 02/18/2014 | M&M Beatty LLC | Laboratory RX | $1739.43 | compound profit – dec 2013 |

17. The conspirators continually looked for ways to generate the most profits from compound prescriptions. For instance, on or around December 11, 2013, BEATTY sent ▇▇▇ and MYERS an email indicating that he was following up on ▇▇▇ phone call about

reimbursement for testosterone compounds and had determined that "the troches pay better than the creams."

### Sale of FALLSTON PHARMACY

18. In or around December 2013, BEATTY sold FALLSTON PHARMACY to another pharmacy. Pursuant to the Asset Purchase Sale Agreement entered into between the parties, BEATTY agreed to remain as an employee of the new pharmacy for one year following the sale of FALLSTON PHARMACY. In discussions involving the sale, BEATTY notified the new owner of the arrangement with ▮▮▮ and MYERS. The owner of the new pharmacy informed BEATTY that the arrangement should be continued under the terms originally negotiated by ▮▮▮ MYERS, and BEATTY.

19. After the sale of FALLSTON PHARMACY, BEATTY remained directly involved in the kickback arrangement between ▮▮▮ MYERS, and the new pharmacy. MYERS regularly communicated with BEATTY to obtain information about what compounded formulas "paid the best" and what amounts the prescriptions reimbursed at, so that MYERS could inform ▮▮▮ and the other doctors involved in the scheme of the best prescriptions to prescribe to patients. MYERS directly monitored the kickback payments being sent from the pharmacy and required monthly compound dispensing reports reflecting detailed information involving the prescriptions involved in the arrangement. These spreadsheets contained information such as the name of the prescribing doctor, the patient name, the insurance company, the compound type, the insurance payment, the patient co-pay, the total collected, and the net profit. Some of these spreadsheets identified TRICARE as the insurance company.

20. The conspirators were constantly interested in generating more revenue from the prescriptions, and on or around February 18, 2014, MYERS sent BEATTY an email noting that

some of ▇▇▇ prior TRICARE prescription reimbursements had averaged around $2,500 but that the new pharmacy was only averaging approximately $1,300 for these prescriptions. BEATTY responded to this message by stating that they could "shoot for higher reimbursement."

21. In an email dated March 6, 2014, MYERS directed BEATTY to make sure the checks from the new pharmacy were made out to Laboratory RX, instead of MYERS, and that they were mailed to HANOVER MEDICAL, located in Bel Air, Maryland. HANOVER MEDICAL is solely owned by ▇▇▇

22. ▇▇▇ and MYERS sent a significant amount of compound prescriptions, including prescriptions reimbursed by TRICARE, to the pharmacy. In April of 2014, MYERS sent BEATTY an email requesting that the kickback be increased to 60% based on "our increase in scripts sent as well as revenue generated." BEATTY conveyed this request to the new owners of FALLSTON PHARMACY.

23. ▇▇▇ also remained heavily involved in making sure the kickback arrangement was as lucrative as possible for the conspirators. For instance, in January of 2014, ▇▇▇ contacted BEATTY by email to try to determine a solution to the problem that because the new pharmacy was a located in Maryland, it could not mail prescriptions to ▇▇▇ patients located in Virginia pursuant to Virginia law. Specifically, ▇▇▇ proposed: "Now that [▇▇▇ had] an office in MD can [BEATTY] fill VA scripts if they are mailed to [▇▇▇ MD office and [▇▇▇ hand deliver[s] them to the [patients] in VA? Most would be TRICARE [patients]."

24. As a result of this discussion, the new pharmacy ultimately delivered prescriptions to ▇▇▇ Maryland office so that ▇▇▇ could deliver the prescriptions to patients. ▇▇▇ followed up with a separate email two days later, on January 9, 2014 in which ▇▇▇ stated, "I really need to make sure any script from my office [gets] mailed to my MD office until ur

[Virginia] liscence [sic] comes in. We have 6 providers so really would Like [sic] to get [prescription] pads right away. U should get about 100-150 [prescriptions] thru my office per month." The reference to "6 providers" meant six physicians.

25. In a separate email, sent on or around January 14, 2014, ▇ informed BEATTY that ▇ wanted to discuss various scar creams and "what they pay and what insurances are paying for it." ▇ was specifically interested in scar creams because they paid high reimbursements from health insurance programs, including TRICARE, at the time.

26. On or around March 26, 2014, ▇ sent BEATTY an email complaining that they needed the pharmacy to communicate better with the patients. ▇ stated: "[MYERS] and I can get you busier but the [patients'] contact needs to get better." Based on interactions such as these, BEATTY understood that ▇ received remuneration from the kickback scheme.

27. In or around April 2014, BEATTY, MYERS, and ▇ met for dinner again at a restaurant in Baltimore, Maryland to discuss issues related to the kickback arrangement. Also present at the meeting were the pharmacy manager and compounding technician at the new pharmacy. One purpose of the meeting was that MYERS had indicated, pursuant to an email sent on March 28, 2014, that he had "several opportunities [he] was working on that would lead to a large increase [in] scripts and we need to discuss handling this." At one point during this meeting, ▇ began screaming at the compounding technician because other pharmacies were billing significantly more money for compounded prescriptions than ▇ received from the new pharmacy. ▇ indicated the new pharmacy should be billing more and he made it clear that the new pharmacy needed to find ways to bill health insurance programs and get paid more for the compounded prescriptions.

28. In addition to the concerns raised at this meeting, another source of frustration for ▆▆▆ and MYERS was that the new pharmacy did not pay the amount agreed upon for each prescription. ▆▆▆ specifically raised this complaint to BEATTY.

29. On or around June 2, 2014, BEATTY and the manager of the new pharmacy discussed approaching MYERS and ▆▆▆ to ask how MYERS and ▆▆▆ wanted the pharmacy to address patients with high co-payments for the prescriptions. They wanted guidance on whether MYERS and ▆▆▆ wanted the pharmacy to waive the patient co-payments for these prescriptions since they were "still making a significant amount on the claims" but BEATTY and manager of the new pharmacy wanted to discuss whether MYERS and ▆▆▆ would be willing to share the losses if the pharmacy did not collect the co-payments.

30. Although BEATTY was aware that the pharmacy was contractually obligated to collect co-payments from insured patients, during the kickback arrangement, ▆▆▆ specifically asked BEATTY to waive certain patient co-payments. BEATTY understood that ▆▆▆ wanted to waive the co-payments because the co-payments for compounded medications were often expensive and many of the patient either could not afford them or would not be willing to pay them. Nevertheless, because the insurance companies were paying such high reimbursements for compounded medications, it was still lucrative for the new pharmacy and ▆▆▆ through the kickback scheme, to waive co-payments. BEATTY knew at this time that waiving patient co-payments was inappropriate and violated the pharmacy's contract with health insurance programs.

31. TRICARE patients were critical to the kickback scheme because patient co-payments were not a significant barrier to reimbursement. TRICARE only required the patients to pay a $17 co-pay for the compounded medications regardless of how much TRICARE reimbursed for the item.

32. During the time after BEATTY sold the pharmacy but while he remained involved in the kickback scheme as an employee, the new pharmacy sent the following payments to MYERS through LABORATORY RX:

| Check Date | From | To | Amount | Memo Note |
| --- | --- | --- | --- | --- |
| 02/07/2014 | Fallston Pharmacy | Seth Myers | $11,153.64 | Jan-Total |
| 04/01/2014 | Fallston Pharmacy | Laboratory RX | $5,000.00 | Feb-Comp |
| 04/15/2014 | Fallston Pharmacy | Laboratory RX | $47,054.35 | March compounding commission |
| 05/19/2014 | Fallston Pharmacy | Laboratory RX | $49,050.00 | |
| 05/20/2014 | Fallston Pharmacy | Laboratory RX | $24,595.64 | |
| 05/23/2014 | Fallston Pharmacy | Laboratory RX | $24,595.64 | April 2014 |
| 06/05/2014 | Fallston Pharmacy | Laboratory RX | $21,337.58 | May account payments |
| 06/12/2014 | Fallston Pharmacy | Laboratory RX | $21,337.58 | May account payments |
| 06/18/2014 | Fallston Pharmacy | Laboratory RX | $21,337.58 | May account payments |

Approximately $172,140.31 of this money was for kickbacks from prescriptions for TRICARE patients. In total, TRICARE paid approximately $344,280.62 to the pharmacy for the prescriptions included in the kickback scheme, and the pharmacy profited approximately $295,782.03 from payments made by TRICARE for compound prescriptions that were part of the kickback scheme, after estimated expenses are deducted.

### *Laboratory Rx of Maryland*

33. Subsequent to the sale of FALLSTON PHARMACY, ▮▮▮ and MYERS were ultimately not happy with the business relationship with the new pharmacy. ▮▮▮ and MYERS began discussing opening their own pharmacy, which would be called LABORATORY RX OF

MARYLAND. ▮▮▮ and MYERS wanted BEATTY to work at this pharmacy as the Pharmacist-In-Charge. The plan was for ▮▮▮ the other doctors in ▮▮▮ primary medical practice, and the other doctors that MYERS and ▮▮▮ had recruited to send their prescriptions to LABORATORY RX OF MARYLAND. LABORATORY RX would receive 90% of the profits and BEATTY would receive 10% of the profits.

34. On or about May 19, 2014, BEATTY and MYERS, on behalf of LABORATORY RX, entered into an agreement regarding the operation of LABORATORY RX OF MARYLAND and the division of the profits. While MYERS (not ▮▮▮ signed the contract, BEATTY understood that ▮▮▮ would control and direct the enterprise. BEATTY understood that ▮▮▮ could not be a party to the written contract because in Maryland it is impermissible for a physician to be an owner of a pharmacy. Despite the fact that ▮▮▮ did not sign the contract, BEATTY further understood that ▮▮▮ was involved in this venture because of ▮▮▮ significant participation in discussions about the project, the fact that ▮▮▮ directed BEATTY to meet with ▮▮▮ brother, who had access to a space where ▮▮▮ believed they could establish the pharmacy, and because ▮▮▮ and the other doctors at his practice planned to send a large number of prescriptions to the proposed pharmacy.

35. BEATTY understood that ▮▮▮ would obtain a financial benefit from the arrangement. Ultimately, an alarm system was installed, a contractor, who was a contact of ▮▮▮ modified the space to make it appropriate for a compounding pharmacy, equipment was purchased, and a bank account was set up. The space was inspected by the Maryland Board of Pharmacy and received the requisite approvals.

36. However, because of the prior kickback agreement and the amount of money involved, BEATTY grew concerned about the project and started delaying tasks he was supposed

to accomplish. ▮ and BEATTY became frustrated with BEATTY and they ultimately parted ways with BEATTY. LABORATORY RX of MARYLAND was never opened.

37. During the time period of the events in question, BEATTY understood that ▮ would specifically benefit from the monetary relationship with LABORATORY RX and MYERS because of ▮ significant involvement and interest in every facet of the arrangement. BEATTY further understood that if he or the new owner of FALLSTON PHARMACY stopped paying LABORATORY RX, ▮ and MYERS would stop sending prescriptions to FALLSTON PHARMACY and the new pharmacy because BEATTY understood ▮ and MYERS primarily cared about receiving as large a kickback as possible from the compound prescriptions ▮ wrote.

38. In or around the fall of 2014, BEATTY was terminated from FALLSTON PHARMACY by the new owner.

### III. CONCLUSION

39. BEATTY acknowledges that the foregoing Statement of Facts does not describe all of his conduct relating to the offense charged in this case.

40. The acts taken by BEATTY in furtherance of the offense charged in this case, including the offense charged above, were done willfully, knowingly, and with the specific intent to violate the law, and were not committed by mistake, accident, or other innocent reason.

41. The Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against BEATTY regardless of whether the plea agreement is presented to or accepted by the court. Moreover, BEATTY waives any rights that he may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

Respectfully submitted,
G. Zachary Terwilliger
United States Attorney

By: _____
Monika Moore
Uzo Asonye
Assistant United States Attorneys

**Defendant's Signature**: After consulting with my attorney and pursuant to the plea agreement entered into this day between the United States and me, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 5/29/20

_____
MICHAEL BEATTY
Defendant

**Defense Counsel's Signature**: I am the attorney for the defendant, MICHAEL BEATTY, in this case. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 5-29-2020

_____
David Carlin, Esq.